## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Janice E. Simon,<br><br>                  Plaintiff,<br><br>v.<br><br>Anoka County Social Services and Lisa Gray, individually and in her representative capacity,<br><br>                  Defendants. | Case No. 12-cv-2754 (SRN/JSM)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Margaret O'Sullivan Kane, Kane Education Law, LLC, 420 Summit Avenue, Suite 306, St. Paul, MN 55102, for Plaintiff.

Andrew T. Jackola, Bryan D. Frantz, David A. Cossi, Nancy Norman Sommer, Robert D. Goodell, Anoka County Attorney's Office, 2100 Third Avenue North, Suite 720, Anoka, MN 55303, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. No. 47]. For the reasons that follow, the Court grants Defendants' Motion.

### I.    BACKGROUND

#### A. Parties

On October 26, 2012, Plaintiff Janice E. Simon ("Plaintiff" or "Simon") filed this action against Anoka County Social Services and Lisa Gray, in her individual and representative capacity, for alleged violations of the Due Process Clause of the United States and Minnesota State Constitutions stemming from maltreatment and

disqualification decisions made by the Minnesota Department of Human Services. (Compl. ¶ 1 [Doc. No. 1].)

Simon is the mother of nine adopted children, including her son "M.R."[1]  (Compl. ¶ 9 [Doc. No. 1]; Jackola Aff., Ex. E "Simon Dep." at 15 (hereinafter "Simon Dep.") [Doc. No. 49-1].)  Simon adopted M.R. from India when he was six and one half years old.  (Simon Aff. ¶ 2 [Doc. No. 54].)  When Simon adopted M.R., she was aware that he had "significant special needs."  (Id.)  Currently, M.R. is an adult with developmental disabilities.  (Compl. ¶ 5 [Doc. No. 1].)  Under Minnesota state law, M.R. is an "incapacitated person" or a "vulnerable adult."  (Exhibits in Support of Defs.' Mem. in Opp'n, Ex. 1 [Doc. No. 21-1]; Ex. 5 [Doc. No. 21-2].)  Due to his developmental disabilities, a Minnesota state court appointed guardians to care for M.R. soon after his eighteenth birthday.  (Id.)  Simon was appointed as one of M.R.'s guardians on March 13, 2006.  (Compl. ¶ 10 [Doc. No. 1].)  According to M.R.'s Individualized Service Plan from Anoka County Social Services, M.R. has two other state appointed guardians – his brother, Jared Simon, and his sister, Kyla Reinholdson.  (Kane Aff., Ex. 4 [Doc. No. 56].)

Defendant Anoka County Social Services (ACSS) is a sub-division of Anoka County, which is responsible for administering several social service programs, including vulnerable adult protective services.  (See Compl. ¶ 6 [Doc. No. 1].)  Defendant Lisa Gray is employed by ACSS as a social worker.  (Id. ¶ 7.)  Gray has worked at ACSS for

---

[1]     The Court uses initials to refer to Simon's son in order to help preserve the young man's anonymity.

nearly twenty years.  (Jackola Aff., Ex. F "Gray Dep." 115:6-9 (hereinafter "Gray Dep.")

[Doc. No. 49-2].)  Gray was assigned as M.R.'s case manager in 2006.  (Id. at 8:8-13.)

### B.  Simon's Children's Caretakers

Jody Mason began serving as M.R.'s personal care assistant in the summer of

2007, after M.R. graduated from high school.  (Simon Aff. ¶ 6 [Doc. No. 54].)  Mason

continued providing care for M.R. through 2011.  (Id.)  Mason would regularly care for

M.R. in Simon's home three to five hours a day, five days a week.  (Id.)  Additionally,

Mason provided M.R. with respite care on occasional weekends.  (Id.)  Respite care

services are "temporary services provided to a person due to the absence or need for

relief of the primary caregiver, the person's family member, or legal representative who is

the primary caregiver and principally responsible for the care and supervision of the

person."  Minn. Stat. § 245A.02, subd. 15.  In this case, Mason offered temporary relief

for Simon when Mason cared for M.R. over the weekends.

Michael Howe served as a personal care assistant for one of Simon's minor

daughters, Rose.  (Simon Aff. ¶ 4 [Doc. No. 54].)  Like M.R., Rose also has

developmental disabilities.  (See id.)  Howe began caring for Rose in Fall 2009.  (Id.)

Around that time, Howe entered into a romantic relationship with one of Simon's adult

daughters, Sunita Reinholdson.  (Id. ¶ 5.)  Sunita and Howe's relationship has continued

off and on through the present day.  (Id.)  For the purposes of this litigation, Sunita

created a chronology of her relationship with Howe.  (Kane Aff., Ex. 15 at 1 [Doc. No.

63].)  In this document, she explains that Howe became physically aggressive toward her

in July 2010.  (Id.)  Sunita also alleges that Howe told her that he was planning on

3

reporting her mother, Simon, "because he didn't like her." (Id. at 2.)  Although Sunita's signature appears at the end of the typed chronology, her signature is not notarized.[2]

### C. Maltreatment Allegations and DHS Findings

On March 22, 2011, ACSS received a report that Plaintiff was verbally and physically abusing M.R., and was financially exploiting him.  (Exhibits in Supp. of Defs.' Mem. in Opp'n, Ex. 2 "Vulnerable Adult Maltreatment Report" at 10 [Doc. No. 21-1].) The report identifies the individual who reported the alleged abuse as "caller." (Id. at 18.)  The Chronology Summary of the Vulnerable Adult Maltreatment Report later identifies the caller as "Michael Howe." (Id. at 10.)  Howe alleged that Simon yells at M.R., slapped M.R. on more than one occasion, and calls M.R. names. (Id.)  Howe also claimed that Simon denies M.R. access to any of his money. (Id.)  Howe explained that he knew of this maltreatment because he "was working at the house at the same time for a younger child." (Id.)

Mary Banister, an ACSS investigator, was assigned the task of investigating the maltreatment allegations. (Id.)[3]  On April 11, 2011, Banister called Gray, M.R.'s case

---

[2]    Defendants correctly assert that this chronology, or affidavit, would be inadmissible evidence at trial.  (Defs.' Reply at 6 [Doc. No. 67].)  According to Mays v. Rhodes, unsworn accounts are inadmissible hearsay.  255 F.3d 644, 648 (8th Cir. 2001); see Fed R. Civ. P. 56(e); Cronquist v. City of Minneapolis, 237 F.3d 920, 927 (8th Cir. 2001) (holding that affidavits based on hearsay cannot defeat a summary judgment motion).  Therefore, the Court does not consider Sunita's statements in her chronology in its Order.

[3]    Plaintiff argues that Banister's investigation was flawed because she did not consult M.R.'s physician.  (Pl.'s Mem. in Opp'n at 6-7 [Doc. No. 53].)  However, pursuant to Minn. Stat. § 626.557, subd. 10b, Banister is only required to consult with professionals, such as a physician, "as appropriate."  Plaintiff claims that the Minnesota Rules required Banister to interview M.R.'s doctor.  (Pl.'s Mem. in Opp'n at 6 (citing

manager, to ask about Simon's relationship with M.R. (Id. at 13.) Gray informed

Banister that while Simon "has a very strong personality and is sometimes inappropriate"

with M.R., Gray has "never heard before that [Simon] slapped [M.R.]." (Id.)

Banister also interviewed M.R. about the allegations of abuse. (Id. at 15.) M.R.

allegedly reported that he "yells and screams if he doesn't get his way" with his mother,

Simon. (Id.) He stated that he did not recall his mother slapping him, calling him names,

or swearing at him. (Id.) However, he did recall one incident in which he plugged the

toilet and his mother yelled at him stating that M.R. "should have told someone right

away that he plugged [the toilet] and that he couldn't fix it himself." (Id.) Nonetheless,

M.R. reported that "he got along good with his mother and had no complaints." (Id.)

As part of her investigation, Banister interviewed M.R.'s personal care assistant,

Mason, on April 15, 2011. (Id. at 17.) Mason reported that she had witnessed Simon

verbally abusing her son, and she once witnessed Simon slapping M.R. (Id.) Mason also

explained to Banister that M.R. is often reprimanded by Simon and his sisters if he does

not follow strict rules which are in place in the house. (Id.) For instance, M.R. is "yelled

at for eating his sister[,] Rose's food." (Id.) M.R. is also required to complete his

homework in Simon's cold basement. (Id.) On April 21, 2011, Mason emailed Banister

expressing her concern about Simon's mismanagement of M.R.'s finances and alleged

---

Minn. R. 9555.7300 [Doc. No. 53].) In fact, however, Minn. R. 95555.7300, subp. 3 only
requires an investigator to interview a physician when the "investigation involves an
alleged incident or situation related to a facility." Therefore, even though Banister did
not consult with M.R.'s physician, the Court does not find this fact dispositive of whether
the investigation violated the statute.

that while Simon's daughters are not required to pay Simon rent for living in her house, M.R. is required to pay rent.  (Id. at 26.)

Banister also interviewed Howe on April 15, 2011.  (Id. at 18.)  Howe reported that he had witnessed Simon yelling at M.R. and was also present when Simon stated that she "hate[s] [her] son to the core."  (Id.)  Howe also reported that on one occasion he entered a room after hearing a "scuffle" between Simon and M.R., and M.R.'s cheek appeared as though it had been slapped.  (Id.)  Additionally, Howe alleged that Simon permits M.R.'s sisters to be verbally abusive to M.R.  (Id.)  Howe characterized the punishments that M.R. receives for certain behavior as "unfair," and echoed Mason's concerns about M.R. being forced to complete homework in Simon's cold basement. (Id.)

On April 20, 2011, Banister interviewed Simon as part of her investigation of M.R.'s maltreatment.  (Id. at 23.)  Simon admitted to yelling at M.R. and being a "disciplinarian," but denied calling M.R. stupid or an idiot.  (Id.)  She explained that she instructs M.R. to complete his homework in the basement not as a punishment, but rather to enable him to focus on his work.  (Id. at 24.)  Simon also explained how she uses M.R.'s finances to pay herself for his rent, to pay for his medical co-pays, and to pay for any activities during respite care.  (Id.)  She also explained that the reason why she does not allow M.R., or anyone else in the home, to eat food that is designated for Rose is because Rose may only consume pureed food.  (Id.)  During the interview on April 20, Simon stated that she did not recall slapping M.R (id. at 24) ; however, the next day Simon called Banister to report that she recalled slapping M.R. once when he spit on her

6

face and in her hair (<u>id.</u> at 26). Simon informed Banister that she called M.R.'s

pediatrician after this incident in order to address how she reacted to the spitting. (<u>Id.</u>)

Banister also interviewed Sunita Reinholdson, M.R.'s sister and Howe's on-and-

off girlfriend, on April 20, 2011. (<u>Id.</u> at 25.) Sunita reported that while her mother is

"strict," she has never heard her mother call M.R. names. (<u>Id.</u>) Sunita also explained that

while M.R.'s bedroom door was removed from the hinges for a couple days, this was a

form of punishment that all of Simon's children have been subject to from time to time.

(<u>Id.</u>) She also stated that she witnessed her mother slap M.R. when he talks back to

Simon. (<u>Id.</u>) As for Simon's management of M.R.'s finances, Sunita explained that

Simon gives M.R. money when it is needed and M.R. is otherwise not required to pay for

any household expenses. (<u>Id.</u>) Two of M.R.'s other sisters, Kaiti and Kyla Reinholdson,

also provided interviews for Banister's investigation. (<u>Id.</u> at 29-30.) Neither sister was

able to corroborate the physical abuse and both reported that although their mother used

swear words and often yelled, she treated all of her children equally. (<u>Id.</u>)

On April 26, 2011, Banister consulted with Harry Reynolds, an ACSS employee,

and Lisa Gray. (<u>Id.</u> at 34.) Based on the ACSS Chronology Summary provided, it

appears that initially, Banister concluded that only the verbal abuse and financial

exploitation allegations were substantiated by the investigation. (<u>Id.</u>) After further

discussion with Gray, however, Banister concluded that the physical abuse claim was

also substantiated because three individuals confirmed that Simon slapped M.R. (<u>Id.</u> at

36.) Simon expresses deep concern for the fact that Banister changed her opinion about

whether the physical abuse claim was substantiated after speaking with Gray. (Pl.'s

7

Mem. at 9 [Doc. No. 53].)  She considers this conversation evidence of Gray's and

Banister's bias against Simon and Simon's family.  (Id.)

On April 29, 2011, Banister entered her final disposition in the case and concluded

that the physical abuse, verbal abuse, and financial exploitation allegations were

substantiated.  (Exhibits in Supp. of Defs.' Mem. in Opp'n, Ex. 2 at 37-38 "Vulnerable

Adult Maltreatment Report" [Doc. No. 21-1].)  However, the allegation of caregiver

neglect was "found to be inconclusive."  (Id. at 38.)  Although Gray contributed to the

investigation by providing Banister with information and consulting with Banister after

the interviews were concluded, Defendants claim that Gray was not responsible for

making any final determinations.  (Defs.' Mem. at 6 [Doc. No. 48].)

On May 3, 2011, Banister, Gray, and Gray's supervisor, Morry Akinwale,

informed Simon of the maltreatment findings.  (Gray Dep. 51-52 [Doc. No. 49-2].)

Simon was told that pursuant to administrative procedures, M.R. would be moved to a

temporary respite facility.  (Simon Dep. 138-39  [Doc. No. 49-1].)  During the meeting,

Plaintiff did not object to Gray picking up M.R. and taking him to the new respite care

facility.  (Simon Dep. 140:2-7 [Doc. No. 49-1].)  Simon signed an authorization form

permitting the release of M.R.'s private information to the respite facility.  (Defs.' Mem.

in Opp'n, Ex. 4 [Doc. No. 16-2].)  Gray explained to Simon that the parties would need to

reconvene to execute a "placement plan" to identify M.R.'s new permanent residence and

finalize his ongoing care.  (Gray Dep. 130-34 [Doc. No. 49-2].)  Simon and Gray made

plans to complete the plan on May 20, 2011.  (Jackola Aff., Ex. D "Simon Emails" at 2

[Doc. No. 49-2].)

### D. DHS Administrative Hearings

During Simon's meeting with Banister on May 3, 2011, Simon formally requested reconsideration of the maltreatment finding.  Simon's request for reconsideration was reviewed by Jerry Pederson, Manager of Anoka County Adult and Disability Services.  (Exhibits in Supp. of Defs.' Mem. in Opp'n, Ex. 3 "Reconsideration Letter" [Doc. No. 21-1].)  Pederson reviewed the findings, case notes, and supporting documentation and concluded on May 13, 2011 that he was "unwilling to change the finding."  (Id.)  Seven days later, on May 20, 2011, Simon canceled the meeting that was scheduled to take place that day between her and Gray.  (Jackola Aff., Ex. D "Simon Emails" at 3 [Doc. No. 49-2].)  M.R. remained in the temporary respite care facility during this time.  Simon did not attempt to remove him from the facility.  (Simon Dep. 148:8-19 [Doc. No. 49-1].)

On June 10, 2011, Plaintiff filed an appeal with the Minnesota Department of Human Services (DHS) challenging the maltreatment determination.  (Exhibits in Supp. of Defs.' Mem. in Opp'n, Ex. 5 at 2 [Doc. No. 21-2].)  "Due to the state shutdown, the matter was postponed for several months."  (Id.)  In the meantime, DHS disqualified Plaintiff from working in licensed care facilities and with vulnerable adults.  (Id., Ex. 14 at 1-2 [Doc. No. 21-3].)

DHS Judge Kelly A. Vargo eventually heard Simon's appeal over the course of five days in January and February, 2012.  (Id., Ex. 5 at 2 [Doc. No. 21-2].)  Judge Vargo determined that Simon had maltreated M.R. physically and verbally.  (Id. at 5-6.)  However, Judge Vargo concluded that "the appellant did not maltreat [M.R.] by financial

exploitation." (Id. at 6.)  Judge Vargo's ruling was based on the following factual

findings: (1) Simon frequently shouted at M.R. and used profanity; (2) Simon called

M.R. "stupid" or "stupid idiot;" (3) Simon called M.R. "dumb" or a "fucking idiot;" (4)

Simon told M.R. to "shut up;" and (5) Simon slapped M.R. across the face.  (Id. at 2-3.)

The court determined that Simon's "denial that she never called [M.R.] derogatory names

is not credible and not supported by the totality of the record including [her] own

testimony." (Id. at 5.)  On March 26, 2012, the DHS Commissioner adopted Judge

Vargo's findings, legal conclusions, and maltreatment determination. (Exhibits in Supp.

of Defs.' Mem. in Opp'n, Ex. 6 [Doc. No. 21-2].)

On July 12, 2012, DHS Judge Douglass C. Alvarado held an evidentiary hearing

on Simon's disqualification to work in licensed care facilities.  (Exhibits in Supp. of

Defs.' Mem. in Opp'n, Ex. 17 [Doc. No. 21-3].)  Judge Alvarado affirmed the

disqualification determination based on similar findings of fact that supported the

maltreatment decision.  (Id. at 17.)  The DHS Commissioner adopted Judge Alvarado's

findings and recommendation on September 26, 2012.  (Id. at 18.)

As a result of the maltreatment and disqualification findings, Simon was

terminated by her employer, Children's Home Society.  (Simon Aff. ¶ 10 [Doc. No. 54].)

Simon worked for Children's Home Society from April 17, 2000 to August 1, 2011.  (Id.)

Simon alleges that, with the exception of the allegations of abuse underpinning this

lawsuit, she was never disciplined nor received a complaint while she was an employee at

Children's Home Society.  (Id.)

### E. Plaintiff's Claims

Pursuant to Minnesota state law, a party may seek judicial review of a DHS administrative decision by bringing a state court action within thirty days of the decision. See Minn. Stat. § 256.045, subd. 7. However, Plaintiff failed to file a state court action within this time frame to challenge either Judge Vargo's or Judge Alvarado's rulings. Instead, Simon filed this lawsuit against Defendants on October 26, 2012. (See generally Compl. [Doc. No. 1].)

Plaintiff's Complaint states three counts against Defendants ACSS and Lisa Gray. In Count One, Plaintiff claims that Defendants "intentionally and deliberately deprived Plaintiff of her civil rights guaranteed by the Fourteenth Amendment to the United States Constitution by depriving her of [her] liberty interest in her familial integrity." (Compl. ¶ 26 [Doc. No. 1].) In Count Two, Plaintiff alleges that Defendants' actions violated Plaintiff's civil rights guaranteed by Article 1, Section 7 of the Minnesota Constitution. (Id. ¶ 31.) Finally, in Count Three, Plaintiff appeals the DHS's maltreatment and disqualification decisions. (Id. ¶ 36.)

Plaintiff's three counts rest upon a single set of factual allegations. First, Simon takes issue with the process by which Banister completed her investigation. (Pl.'s Mem. in Opp'n at 6 [Doc. No. 53].) Simon contends that Banister failed to follow the DHS Guidelines. (Id.) Specifically, Plaintiff argues that Banister failed to collect M.R.'s relevant medical records or speak with M.R.'s physician. (Id. at 6-8.)

Second, Simon claims that she was denied pre-deprivation due process since M.R. was removed from her care before the DHS administrative hearings took place. Simon

11

contends that Banister's conclusions were not driven by her own investigation, but instead were a result of Gray manipulating Banister to find that the physical abuse allegation was substantiated.  (Id. at 9.)  Additionally, Simon argues that Gray's bias against Plaintiff and her family is evidenced by the fact that Gray uses reporting as a technique to penalize M.R.'s legal guardians unfairly or without cause.  For instance, Gray reported Kyla Reinholdson, one of M.R.'s other guardians, on two occasions.  Once, Gray reported Kyla for failing to report the alleged abuse taking place in her home.  (Id. at 27.)  Simon argues that this particular report was unfair because Gray did not report Mason, M.R.'s personal care assistant, even though Mason also allegedly witnessed abuse in the home.  (Id.)  Gray also reported Kyla after she declined to sign paperwork approving M.R.'s removal from Simon's home and placement in a different facility.  (Id.)

Third, Plaintiff also alleges that she received insufficient and untimely post-deprivation due process.  Plaintiff contends that the DHS administrative hearings were procedurally flawed for several reasons.  Simon argues that she was unable to present evidence substantiating Howe's bias against Simon's family, which stems from his abusive relationship with Simon's daughter, Sunita. (Id. at 12).  She also claims that she did not receive a fair maltreatment hearing because certain documents were not admitted (Simon Dep. 62:5-6 [Doc. No. 49-1]); portions of the recorded hearing were "taped over" (id. at 62:6-9); the DHS judge who presided over the first two days of the hearing, Judge Johnson, did not render the final decision (id. at 63-64); Judge Vargo, the DHS judge who rendered the final decision, based her decision on an incomplete transcript of the

hearing since portions of the hearing were taped over (id.); and Judge Vargo

misidentified Simon in her findings of fact, which reflects her lack of knowledge about

the facts of Simon's case (id. at 65:19-25).  Simon also argues that she was denied the

opportunity to present evidence associated with the DHS hearings "because the

transcripts of the proceedings were prohibitively priced at $11,000.00."  (Pl.'s Mem. at

13 [Doc. No. 53].)[4]

## II.    DISCUSSION

### A.  Improper Municipal Defendant

As an initial matter, the Court addresses whether Plaintiff brought this suit against

the proper municipal defendant.  Based on the discussion below, the Court finds that

Simon's claims against Anoka County Social Services must be dismissed.  Furthermore,

because Plaintiff failed to properly bring suit against Anoka County, this action lacks any

valid municipal defendants.

### 1.  Anoka County Social Services

Simon filed this lawsuit against ACSS.  (Compl. ¶ 1 [Doc. No. 1].)  Pursuant to

Federal Rule of Civil Procedure 17(b)(3), parties, which are not individuals or

corporations, may be sued depending on "the law of the state where the court is located."

As this Court is located in Minnesota, it looks to Minnesota state law.  Under Minnesota

---

[4]      Defendants argue that Simon may not summarize her recollection of Gray's and
Banister's DHS hearing testimony, and offer this summary as admissible evidence.
(Defs.'s Reply at 4 [Doc. No. 67].)  According to Cronquist v. City of Minneapolis,
affidavits based on hearsay cannot be used to defeat a summary judgment motion.  237
F.3d 920, 927 (8th Cir. 2001) (citing Fed. R. Civ. P. 56(e)).  Based on Cronquist and Rule
56(e), the Court agrees with Defendants.  Therefore, the Court only relies on non-
hearsay-based arguments advanced by Plaintiff.

state law, "every municipality is subject to liability for its torts and those of its officers,

employees and agents acting within the scope of their employment or duties whether

arising out of a governmental or proprietary function." Minn. Stat. § 466.02 (2014).  A

"county" is considered a "municipality;" and therefore, may be sued.  See Minn. Stat. §

466.01, subd. 1 (2014) ("municipality means . . . any county"); Minn. Stat. § 373.01,

subd. 1(a)(1) (2014) ("[e]ach county is a body politic and corporate and may sue and be

sued").

However, "[c]ourts in our District have consistently held that, under Minnesota

law, County Departments are not entities which may be sued." Follis v. Minnesota Atty.

Gen., No. 08-cv-1348 (JRT/RLE), 2010 WL 3399674, at *7 (D. Minn. Feb. 16, 2010)

adopting report and recommendation, No. 08-cv-1348 (JRT/RLE), 2010 WL 3399958 (D.

Minn. Aug. 26, 2010).  For this reason the Follis Court held that the Todd County

Department of Human Services and the Morrison County Department of Human Services

should be dismissed as improper defendants pursuant to Rule 17(b).  Id.

Similarly in Everts v. United States Social Security Administration, et al., this

Court held that the Hennepin County Human Services and Public Health Department "is

a mere operating department of Hennepin County and, under Minnesota law, it is not

capable of suing or being sued."  No. 08-cv-4690(DWF/FLN), 2009 WL 3062010, at *2

(D. Minn. Sept. 18, 2009) (citing State v. Civil Serv. Comm'n of City of Minneapolis,

154 N.W.2d 192, 194 (Minn. 1967)); see also Neudecker v. Shakopee Police Department,

2008 WL 4151838, at *11 (D. Minn., Sept. 3, 2008) (finding that county DHS and city

police department are not subject to suit); In re Scott County Master Docket, 672 F. Supp.

14

1152, 1163 n.1 (D. Minn. 1987) (dismissing claims against county attorney's office and sheriff's department because they were "not legal entities subject to suit").

Although the actions of a county department or commission "may subject the county itself to liability, [a county department or commission] itself is not a proper defendant subject to suit in a section 1983 lawsuit." Shimer v. Shingobee Island Water and Sewer Comm'n, No. 09-cv-953 (JRT/FLN), 2003 WL 1610788, at *3-4 (D. Minn. Mar. 18, 2003) (dismissing claims against the Water and Sewer Commission, but holding that the Commission's actions may serve as a basis for the county's liability).

Here, ACSS, as a sub-division of Anoka County, is an improper defendant for Plaintiff's action. Plaintiff even concedes this point in her brief. (Pl.'s Mem. in Opp'n at 34 (stating that "this Court may find that ACSS is not a proper party to this lawsuit because the County itself must be sued") [Doc. No. 53].) Therefore, pursuant to Fed. R. Civ. P. 17(b)(3) and Minnesota state law, ACSS is not subject to suit. See, e.g., Follis, 2010 WL 3399674, at *7; Everts, 2009 WL 3062010, at *2. Accordingly, the Court dismisses Plaintiff's claims against ACSS.

## 2.  Anoka County

Although the actions of a county department "may subject the county itself to liability," Shimer, 2003 WL 1610788, at *3-4, in order for a county to be a proper defendant in a lawsuit, a plaintiff must follow the Federal Rules of Civil Procedure in properly naming the county as a defendant in the summons, and adequately serving the county with process, see Fed. R. Civ. P. 4(a), (m). Here, Defendants argue that Simon failed to both name Anoka County as a defendant in its Summons and Complaint, and

failed to properly serve Anoka County with process.  (Defs.' Mem. at 17-18 [Doc. No. 48].)  The Court agrees.

Under Federal Rule of Evidence 4(a), a summons must "name the court and the parties; [and] be directed to the defendant."  Fed. R. Civ. P. 4(a)(1)(A), (B). Additionally, Rule 4(m) states that unless "the plaintiff shows good cause," a defendant must be served with a summons and complaint "within 120 days after the complaint is filed."  If the defendant is not served with a summons and complaint, then the Court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  Fed. R. Civ. P. 4(m).

Here, Plaintiff filed her Complaint on October 26, 2012.  (See Compl. [Doc. No. 1].)  The Summons in this case was issued on October 26, 2012 and then re-issued on November 2, 2012.  (See Docket Report).  In both instances the Summons was issued to Lisa Gray and ACSS.  (Id.)  Anoka County was neither listed as a Defendant on the Complaint, nor issued a Summons.  Plaintiff attempted to serve Anoka County with a Summons and the Complaint on July 12, 2013.  (Farmer Aff. [Doc. No. 25].)  While Rule 4(m) requires service of process within 120 days of filing the Complaint, Plaintiff served Anoka County 259 days after the Complaint was filed.  See Fed. R. Civ. P. 4(m).  Simon not only exceeded the Rule 4(m) time limit by 139 days, but she failed to seek relief or a time extension from the Court.  Moreover, Simon did not properly list Anoka County as a Defendant on the Summons or Complaint, as is required by Rule 4(a).  See Fed. R. Civ. P. 4(a).  Therefore, as the pleadings currently stand, Simon has failed to name Anoka County as the proper municipal defendant in this case.

16

Additionally, Simon may no longer amend her Complaint and Summons at this point in the litigation.  According to the Pretrial Scheduling Order, parties must have amended all pleadings by June 1, 2013.  (Pretrial Scheduling Order at 1 [Doc. No. 9].)  Defendants correctly state that "[t]he period for seeking amendment to the pleadings has now closed."  (Defs.' Mem. at 17 [Doc. No. 48].)  The Court recognizes that Plaintiff has not requested the Court for relief from the June 1, 2013 deadline.  However, even if Simon had requested an extension, the Court would nonetheless deny this request.  According to Federal Rule of Procedure 16(b)(4), "[a pretrial] schedule may be modified only for good cause and with the judge's consent."  Harris v. FedEx National LTL, Inc., 760 F.3d 780, 786 (8th Cir. 2014); see Popoalii v. Corr. Med. Servs., 512 F.3d 488, 497 (8th Cir. 2008).  The United States Court of Appeals for the Eighth Circuit explained in Sherman v. Winco Fireworks, Inc. that "[t]he primary measure of good cause is the movant's diligence in attempting to meet the [scheduling] order's requirements."  532 F.3d 709, 716-17 (8th Cir. 2008) (internal quotations omitted).  For this reason, whether or not a court amends a scheduling order is based mainly "on the diligence of the party who sought modification."  Id.; see Harris, 760 F.3d at 786.

Here, the evidence demonstrates that even if Simon had now sought modification of the Pretrial Scheduling Order, she would not be acting diligently.  On June 27, 2013, Defendants alerted Plaintiff that she failed to name the proper governmental defendant.  (See Defs.' Mem. in Opp'n at 14-16 [Doc. No. 15].)  On July 11, 2013, Plaintiff replied by claiming that she "scheduled a Motion to Amend the Scheduling Order, Amend the Complaint and Add Necessary Party to correct this error [before Magistrate Judge Janie

S. Mayeron on August 29, 2013]." (Pl.'s Reply at 5 [Doc. No. 22].) A review of the

Docket Report in this case evidences that Plaintiff did not submit a motion requesting this

hearing; this hearing was not scheduled; and indeed, never took place. Instead, the only

impending hearing that was scheduled was for Plaintiff's Motion for Partial Summary

Judgment and Declaratory Judgment on July 29, 2013 [Doc. No. 20]. However, this

hearing was canceled when Simon withdrew her Motion. (Letter from Margaret

O'Sullivan Kane to Judge Susan Richard Nelson (July 23, 2013) [Doc. No. 27].)

On September 13, 2013, Plaintiff again represented to the Court that she intended

to amend her Complaint to add the proper governmental defendants. (See Parties'

Stipulation for Continuance of Settlement Conference at 1 (stating that "during the

settlement conference [on September 10, 2013], Plaintiff's Counsel indicated she

intended to file an additional complaint naming The Minnesota Department of Human

Services and the Anoka County Commissioners [sic] as parties") [Doc. No. 29].)

However, Simon never filed a motion to seek relief from the Court to amend her

Complaint and add Anoka County as a defendant.

Plaintiff's awareness of the procedural deficiency, her representations to the Court,

and her unexplained failure to file the proper motions demonstrate that Simon did not act

diligently to amend the scheduling order. Plaintiff has missed the Pretrial Scheduling

Order deadline by approximately seventeen months even though she has been fully aware

of the motions she needed to file. Courts have not permitted other plaintiffs in Simon's

position to amend their complaints this late in the proceedings. See, e.g., Barstad v.

Murray County, 420 F.3d 880, 883 (8th Cir. 2005) (affirming the district court's denial of

leave to amend the plaintiffs' complaint under Rule 16(b) because the plaintiffs had eight months to request an amendment of the scheduling order and "knew of the claims they sought to add when they filed the original complaint"); <u>Freeman v. Busch</u>, 349 F.3d 582, 589 (8th Cir. 2003) (affirming, under Rule 16(b), the district court's denial of the plaintiff's motion to amend her complaint because she provided no reasons why the amendment could not have been made earlier or why her motion to amend was filed so late). Therefore, even if Simon had filed a motion to modify the scheduling order, the Court would deny it.

Pursuant to Rule 4(a) and (m), the Court finds that Anoka County, like ACSS, is not a proper defendant in this case. Accordingly, Plaintiff's action lacks a valid municipal defendant.

### B. Standard of Review

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" <u>Celotex Corp.</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. <u>Id.</u> at 323. However, "a party opposing a

properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Defendants move for summary judgment on all three of Plaintiff's counts. Each count is discussed in detail below.

### C. Count One: Section 1983 Due Process Claims Against Defendant Gray

As no proper municipal defendant exists in this case, Plaintiff's Count One § 1983 claim is limited to Lisa Gray, in her individual and official capacities. Simon alleges that Gray violated the Due Process Clause of the Fourteenth Amendment and deliberately deprived her of a "liberty interest in her familial integrity" by removing M.R. from Simon's care. (Compl. ¶ 26 [Doc. No. 1].) Plaintiff's § 1983 claim is premised on a violation of substantive and procedural due process rights.

Defendants argue that Plaintiff's Count One fails as a matter of law because Gray is entitled to qualified immunity. (Defs.' Mem. at 19 [Doc. No. 48].) However, "[q]ualified immunity is a defense only against a claim in one's individual capacity." Bankhead v. Knickrehm, 360 F.3d 839, 844 (8th Cir. 2004) (citing Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999)). In contrast, "[s]uits against public

employees in their official capacity are the legal equivalent of suits against the governmental entity itself." Bankhead, 360 F.3d at 844 (citing Buford v. Runyon, 160 F.3d 1199, 1201 n.3 (8th Cir. 1998)). Therefore, Defendants' qualified immunity defense applies only to Gray's liability in her individual capacity.

As to Gray's liability in her official capacity, Defendants argue that Plaintiff's § 1983 claim fails because the facts do not demonstrate that the alleged constitutional violation was "exceptionally egregious." (Defs.' Mem. at 28 [Doc. No. 48].) Thus, the Court proceeds by addressing: (1) whether Gray, in her individual capacity, is entitled to qualified immunity for a substantive due process claim and/or a procedural due process claim; and (2) whether Plaintiff's claim against Gray, in her official capacity, survives summary judgment.

### 1. Gray's Qualified Immunity, in Her Individual Capacity

"To hold [Gray] liable for a violation of the right to intimate association, Plaintiff[] must show an intent to interfere with [her] familial relationship." Ray v. Hauff, No. 09-cv-922 (MJD/JJK), 2010 WL 1390866, at *8 (D. Minn. Mar. 31, 2010) (citing Reasonver v. St. Louis County, Mo., 447 F.3d 569, 585 (8th Cir. 2006)). For the purposes of summary judgment, the Court assumes that Gray had the requisite intent. Nonetheless, the Court must grant summary judgment for Defendants if Gray is entitled to qualified immunity. Id.

"On a motion for summary judgment, the Court employs a three-part test to determine whether qualified immunity exists." Doe v. Tsai, No. 08-cv- 1198 (DWF/AJB), 2010 WL 2605970, at *7 (D. Minn. June 22, 2010) aff'd sub nom. Doe ex

21

rel. Thomas v. Tsai, 648 F.3d 584 (8th Cir. 2011) (citing Goff v. Bise, 173 F.3d 1068,

1072 (8th Cir. 1999)).  Gray is not entitled to qualified immunity if Plaintiff satisfies each

of the three prongs of the test.  First, Simon must show that "the facts, viewed in the light

most favorable to the plaintiff, demonstrate the deprivation of a constitutional . . . right."

Howard v. Kansas City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009).  Second, Simon

must prove that the alleged right was clearly established.  Id.  The Court has discretion as

to which of these two inquiries to address first.  Pearson v. Callahan, 555 U.S. 223, 235-

36 (2009).  Third, "the plaintiff must raise a genuine issue of material fact as to whether

the official would have known that the alleged action violated the plaintiff's clearly

established rights."  Tsai, 2010 WL 2605970, at *7.  Generally, "[q]ualified immunity is

available 'to all but the plainly incompetent or those who knowingly violate the law.'"

Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004) (quoting Malley v.

Briggs, 475 U.S. 335, 341 (1986)).  "Officials are not liable for bad guesses in gray areas;

they are liable for transgressing bright lines."  Davis v. Hall, 375 F.3d 703, 712 (8th Cir.

2004) (citation omitted).

 In Manzano v. South Dakota Dep't of Social Services, the Eighth Circuit

explained that in § 1983 cases that involve alleged interference with the right to family

integrity, "it is nearly impossible to separate the constitutional violation analysis from the

clearly established right analysis."  60 F.3d 505, 510 (8th Cir. 1995).  Therefore, the

Court's analysis below interweaves these two prongs of the qualified immunity test.

Here, because Gray's actions do not amount to a violation of a clearly established

substantive due process *or* procedural due process constitutional right, Simon's § 1983 claim fails against Gray, in her individual capacity.

### a. Substantive Due Process Claim

Plaintiff alleges that by revoking her guardianship over M.R. without due process, Gray violated Simon's liberty interest in familial integrity. To prevail on a substantive due process claim, Plaintiff must show that "the [state official] acted in an arbitrary or capricious manner, or so as to shock the conscience." Herts v. Smith, 345 F.3d 581, 587 (8th Cir. 2003). "The government action in question must shock the conscience or be otherwise offensive to judicial notions of fairness and human dignity." Tsai, 2010 WL 2605970, at *7 (citing Costello v. Mitchell Public School District 79, 266 F.3d 916, 921 (8th Cir. 2001)). Or in other words, the Court must find that viewing the facts in the light most favorable to Simon, Defendant Gray violated Simon's right to familial integrity in such a manner as to "shock the conscience." See id.

### (1) Simon's Constitutional Interest at Stake

In order to determine if a constitutional violation occurred, the Court must first analyze whether a parent maintains a liberty interest in his or her relationship with a vulnerable adult child. Then, the Court must determine if the facts in this case amount to a clear violation of this right, which shocks the conscience.

The Eighth Circuit has "long recognized that parents have a liberty interest in familial relationships and have an important substantive due process right to control the care and custody of their children." Dornheim v. Sholes, 430 F.3d 919, 925 (8th Cir. 2005) (citing Abdouch v. Burger, 426 F.3d 982, 987 (8th Cir. 2005)). Although, the

Eighth Circuit has not yet ruled on whether a parent maintains this substantive due process right with a vulnerable adult child, this Court has previously held that such a right may exist.  In Ray v. Hauff, this Court explained that a mother had a constitutional right to familial association with an adult child, since the daughter was "a vulnerable adult under court-ordered supervision."  Ray, 2010 WL 1390866, at *8.  Defendants argue that a constitutional right to familial integrity between a parent and an adult child does not exist.  (See Defs.' Mem. at 22 [Doc. No. 48].)  However, given this Court's holding in Ray, the Court assumes, *arguendo*, that a parent has a substantive due process liberty interest in familial integrity with his or her vulnerable adult child.

Plaintiff also claims that Gray violated her property interest in Simon's guardianship of her adult son.  (See Pl.'s Mem. in Opp'n at 16-17 [Doc. No. 53].)  The Eighth Circuit explained in Skeets v. Johnson that "[i]t is well established that property interests 'are created and their dimensions are defined by existing rules or understanding that stem from an independent source such as state law.'"  816 F.2d 1213, 1214-15 (8th Cir. 1987) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)); see also Bishop v. Wood, 426 U.S. 341, 344 (1976) (explaining that a claimed property interest in employment may be created by ordinance or implied contract, but in any event may be established only by reference to state law); Tautfest v. City of Lincoln, 742 F.2d 477, 480 (8th Cir. 1984) (holding that a court must look to an employment contract and to state law to determine if there exists a legitimate claim of entitlement to benefits).  If a status may be terminated at any time, then an individual does not possess a property interest in that status.  See Skeets, 816 F.2d at 1214 (holding that the plaintiff did not possess a

24

property interest in his continued employment since under Arkansas law he was an at-will employee who could be terminated at any time).  Therefore, the Court looks to state law to determine if a court appointed guardian of a vulnerable adult maintains a property interest in her guardianship.

Pursuant to Minnesota state law, a guardian does not maintain a property interest in his or her guardianship.  According to Minn. Stat. § 524.5-313, "[a] guardian shall be subject to the control and direction of the court at all times and in all things."  Minn. Stat. § 524.5-313(a) (2014).  Furthermore, a court grants a guardian "only those powers necessary to provide for the demonstrated needs of the ward."  (Id. § 524.5-313(b).)  A court may modify a guardian's powers, or terminate a guardianship "[o]n petition of any person interested in the ward's welfare," or "may make any other order that is in the best interests of the ward."  Minn. Stat. § 524.5-317(b).  When the court considers a motion for terminating or modifying the guardianship, it follows set procedures "to safeguard the rights of the ward."  Id. § 524.5-317(c).  The fact that state law dictates that (1) a court may control a guardian's power over a ward at all times; and (2) based on the best interests of the ward, a guardian's status may be modified or terminated at any point, demonstrates that a guardian is not entitled to a property interest in his or her status.  See Skeets, 816 F.2d at 1214.

Furthermore, simply because a procedure exists for modifying or terminating a guardianship does not imply that a court appointed guardian has a property interest in that guardianship.  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of

it.  He must, instead, have a legitimate claim of entitlement to it."  Board of Regents v.

Roth, 408 U.S. at 577, 92 S.Ct. at 2709.  Relying on this principle, in Skeets, the Eighth

Circuit held that the "state had an absolute, unconditional right to dismiss [the plaintiff]

without cause because he was an at will employee;" and thus, the plaintiff did not have a

property interest in his continued employment.  Skeets, 816 F.2d at 1215.  Similarly,

here, the state court has an absolute, unconditional right to control the guardian at all

times, and modify or terminate a guardianship based on the best interests of the ward.

See  Minn. Stat. § 524.5-313(a); id. § 524.5-317(b).  While the interests of the vulnerable

adult or ward are considered by the court, the guardian does not have a property interest

in the guardianship itself.  Therefore, the Court finds that Plaintiff does not have a

property interest in the guardianship of M.R., but maintains a liberty interest in familial

integrity.

## (2)  Simon's Liberty Interest in Familial Integrity

Even assuming that Simon maintains a liberty interest in her relationship with her

adult child, this right is not absolute.  See Manzano, 60 F.3d at 510.  A parent's right to

familial integrity must be balanced against the interests of the state and the child.

Relevant to this case, "'[t]he right to family integrity clearly does not include a

constitutional right to be free from child abuse investigations,' as the state has a strong

interest in protecting the safety and welfare of minor children, particularly where

protection is considered necessary as against the parents themselves."  Dornheim, 430

F.3d at 925-26 (quoting Manzano, 60 F.3d at 510 (internal marks omitted)).  Therefore,

the Court is required to "balance the interests of the state and the [child] against the

interest of the parent in determining whether a constitutional violation has occurred." Id.

at 926.  "[W]hen a state official pursuing a child abuse investigation takes an action

which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled

to qualified immunity, if such action is properly founded upon a reasonable suspicion of

child abuse." Thomason v. SCAN Volunteer Services, 85 F.3d 1365, 1371 (8th Cir.

1996) (internal marks omitted).  The state's interest in protecting a child often "makes it

difficult to overcome a qualified immunity defense in the context of a child abuse

investigation." Dornheim, 430 F.3d at 926 (citing Abdouch, 426 F.3d at 987).

### (3)  Causation

When analyzing whether the facts in this case amount to a clear violation of

Simon's right to familial integrity, the Court must first determine whether Gray's actions

actually caused the alleged constitutional deprivation.  "A section 1983 damages action is

in essence a tort damages action.  A plaintiff seeking tort damages cannot withstand

summary judgment if he is unable to satisfy the essential elements of a tort cause of

action, *i.e.,* causation and damages." In re Scott County Master Docket, 672 F. Supp.

1152, 1165-66 (D. Minn. 1987) aff'd sub nom. Myers v. Scott County, 868 F.2d 1017

(8th Cir. 1989).  Therefore, in order to succeed on her claim against Gray, Plaintiff must

allege and prove that "the alleged denial of substantive due process was 'a necessary

condition, or "but for" cause, of the separation of [M.R. from his mother] on which the

claim for damages is based.'" Id. (citing Lossman v. Pekarske, 707 F.2d 288, 291 (7th

Cir. 1983)).

Here, Plaintiff contends that Gray unfairly and prejudicially influenced the outcome of Banister's investigation and the results of the DHS proceedings.  (See generally Pl.'s Mem. in Opp'n [Doc. No. 53].)  Additionally, Plaintiff alleges that Gray personally facilitated M.R.'s transfer from Simon's care to a temporary respite facility.  (Id. at 10.)  The parties do not disagree that Gray was involved in moving M.R. to the temporary respite facility.  Thus, the Court accepts this proposition as an undisputed fact.  For the purposes of summary judgment, the Court also assumes that Gray somehow influenced Banister's investigation results based on the fact that she had a conversation with Banister before the results were finalized.  Accordingly, the Court finds that but for Gray's personal involvement in influencing the results of the maltreatment investigation and removing M.R. from his home, Simon's familial integrity interest would not have been violated.[5]  See In re Scott County, 672 F. Supp. at 1165-66.

---

[5]        In deciphering the basis of Plaintiff's substantive due process claim against Gray, Defendants rely upon an argument advanced by Simon in a previous brief.  In Plaintiff's Memorandum in Support of her Motion for Summary Judgment,  Plaintiff had claimed that Gray violated her due process rights by removing her dependent adult son from her care prior to initiating the procedures set forth in Minn. Stat. § 626.557.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 10-11 [Doc. No. 12].)  Defendants argue that even assuming Plaintiff possesses rights under this statutory provision, Simon's claim still fails because a statutory violation does not amount to a constitutional due process violation.  According to the Eighth Circuit, "unless the rights which form the basis of the plaintiffs' civil rights claims were conferred by state law, a violation of state law is neither cognizable under section 1983 nor results in forfeiture of immunity for the alleged violation of rights which have independent constitutional origin."  Myers v. Morris, 810 F.2d 1437, 1469 (8th Cir. 1987) abrogated on other grounds by Burns v. Reed, 500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991).  As applied to this case, Defendants contend that "Plaintiff cannot maintain a [s]ection 1983 claim against Gray premised upon the alleged violation of [Minn. Stat. § 626.557] because the right to familial integrity does not arise from that law."  (Defs.' Mem. at 21 [Doc. No. 48].)  Insofar as

**(4)  Gray's Conduct Does Not Shock the Conscience**

Even assuming that Gray influenced the removal of M.R. from Simon's home and influenced Banister's conclusion that the physical and verbal abuse claims were substantiated, Plaintiff's allegations still do not rise to the level of a substantive due process violation.  Here, Gray's conduct, viewed in a light most favorable to Simon, did not "shock the conscience."  At most, the record indicates that Gray, a concerned ACSS social worker, pressed Banister to reconsider whether the investigation corroborated the allegation that M.R. was physically abused by Plaintiff.  Plaintiff admitted to Banister that she recalled slapping M.R. on one occasion.  (Exhibits in Supp. of Defs.' Mem. in Opp'n, Ex. 2 at 26 "Vulnerable Adult Maltreatment Report" [Doc. No. 21-1].)  Pursuant to Minn. Stat. § 626.5572, subd. 2(b), "abuse" of a vulnerable adult includes "[c]onduct which is not an accident or therapeutic conduct as defined in this section, which produces or could reasonably be expected to produce physical pain or injury or emotional distress including, but not limited to . . . (1) . . . slapping."  Simon admitted to Banister that she intentionally slapped M.R. when he spit on her.  Therefore, under Minnesota law, her behavior constituted physical abuse.

---

Plaintiff's argument is based on the procedures and rights articulated in Minn. Stat. § 626.557, the Court agrees with Defendants.

However, the Court reads Plaintiff's Complaint and substantive due process argument against Gray differently than Defendants.  Based on Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, the Court understands Plaintiff as arguing that Gray violated Plaintiff's right to familial integrity by unfairly and prejudicially influencing the outcome of Banister's investigation and the DHS proceedings and facilitating M.R.'s transfer to a temporary respite facility from Simon's home.  (See generally Pl.'s Mem. in Opp'n [Doc. No. 53].)

"Abuse" also includes the "use of repeated or malicious oral, written, or gestured language toward a vulnerable adult or the treatment of a vulnerable adult which would be considered by a reasonable person to be disparaging, derogatory, humiliating, harassing, or threatening."  Minn. Stat. § 626.5572(b)(2).  Several individuals that Banister interviewed reported that Simon called M.R. names, such as "stupid," and yelled at him frequently.  (Exhibits in Supp. of Defs.' Mem. in Opp'n, Ex. 5 at 5 [Doc. No. 21-2].) Thus, Gray reasonably recommended that based on the interviews Banister conducted, enough evidence existed substantiating claims that Simon verbally abused M.R.

It does not shock the conscience that based on the facts unearthed by Banister's investigation that Gray recommended that Banister conclude that M.R. was verbally and physically abused.  Any right to familial association was not sufficiently clear such that Gray, an ACSS social worker, could have understood that she was violating this right by helping to remove M.R. from what she thought was an abusive environment.

In similar instances, this Court has concluded that the right to familial association was not clearly violated.  For example, in Ray, the mother-plaintiff challenged the decision of defendants, a social services organization and its employee, to restrict the mother's access to her vulnerable adult child, who was being cared for by defendants. Ray, 2010 WL 1390866, at *1-5. The Court held that "any constitutional right to a familial association was not sufficiently clear such that Defendants, guardians of a vulnerable adult, could have understood that such right was being violated" by restricting the allegedly abusive mother's access to her child.  Id. at *8.  Similarly, in In re Scott County, this Court held that:

> plaintiffs' claims, taken as true for purposes of this summary judgment
> motion, simply do not rise to the level of justiciable substantive due process
> claims.  The individual interests of the plaintiffs, although strong, are more
> than counterbalanced by the state's compelling interest.  The social workers
> simply assisted law enforcement officials by taking part in questioning and
> tending to the details of child foster care placement.  Under the
> circumstances, the actions taken by social workers, although inarguably
> disruptive to the family units of the various plaintiffs, were motivated by
> compassion for the children and are in no way indicative of an "abuse of
> official power which shocks the conscience."

In re Scott County, 672 F. Supp. at 1166-67.  The Eighth Circuit similarly found that a

plaintiff's substantive due process right to familial integrity was not violated in an

analogous child protective custody case.  In Fitzgerald v. Williamson, the Eighth Circuit

held that it did not shock the conscience or otherwise offend judicial notions of fairness

"to hear that caseworkers responsible for an allegedly abused child arranged for the child

to be examined by a psychologist and, after receiving confirmation of child abuse,

reduced the parents' visitation rights and permitted the child to remain with her foster

parent when the foster parent moved out of the parents' geographical area."  787 F.2d

403, 408 (8th Cir. 1986).

Here, Gray, like the defendants in Ray, In re Scott County, and Fitzgerald was

motivated by her concern for M.R.  Although Simon may have a liberty interest in

familial integrity, that interest is sufficiently counterbalanced by Gray's interest in

removing a vulnerable adult from an abusive setting, particularly where the alleged

abuser admitted to slapping the ward.

Moreover, even before an investigation is complete, ACSS has the right to "offer

emergency and continuing protective social services for purposes of preventing further

maltreatment and for safeguarding the welfare of the maltreated vulnerable adult."  <u>See</u>

Minn. Stat. § 626.557, subd. 10(a).  Safeguarding the welfare of the vulnerable adult

includes removing him or her from a potentially abusive environment.  Since ACSS

employees have the right to remove M.R. from a potentially abusive environment, even

before a maltreatment investigation is complete, surely ACSS, acting through Gray, has

the right to remove M.R. after an investigation substantiates claims of abuse.  Therefore,

Gray is entitled to qualified immunity, in her individual capacity, because drawing all

reasonable inferences in favor of Plaintiff, no genuine issues of material fact exist that

Gray's actions constitute a violation of Plaintiff's substantive due process rights under

clearly established law.  <u>See</u> Fed. R. Civ. P. 56(a); <u>Celotex Corp.</u>, 477 U.S. at 322-23;

<u>Anderson</u>, 477 U.S. at 249-50.

### b.  Procedural Due Process Claim

In Simon's § 1983 claim, she also alleges that Defendant Gray violated her

*procedural* due process rights by (1) revoking her guardianship rights without following

the proper procedures mandated by state law; and (2) failing to provide her with notice

and an opportunity to be heard before removing M.R. from her home.  (Pl.'s Mem. at 23-

29 [Doc. No. 53].)

In response, Defendants argue that insofar as Plaintiff's argument is based upon

rights she believes she possesses under the Minnesota Vulnerable Adults Act, Minn. Stat.

§ 626.557, subd. 10, her argument fails.  (Defs.' Mem. at 25 [Doc. No. 48].)  The Court

agrees.  As Defendants aptly note, the "Vulnerable Adults Act was designed to protect

vulnerable adults – *not their guardians* – and prescripts procedures to protect only that

class of persons." (Id.) This Court previously explained in Grozdanich v. Leisure Hills Health Ctr., Inc. that "[a]llowing an individual, such as the Plaintiff, who is not a vulnerable adult, to employ the [Vulnerable Adults Act] as a source of civil liability, does not further [the stated purpose of the statute]." 25 F. Supp. 2d 953, 986 (D. Minn. 1998). Since Plaintiff does not bring this action on behalf of M.R. in a representative capacity, the law does not provide Simon with any procedural due process rights.

Insofar as Plaintiff's argument is based on Gray's failure to provide notice and an opportunity to be heard before M.R. was removed from Simon's home, Defendants contend that Gray is entitled to qualified immunity, in her individual capacity. As noted earlier, to overcome the qualified immunity defense Plaintiff must satisfy three elements. Tsai, 2010 WL 2605970, at *7. First, Simon must show that the facts, viewed in the light most favorable to Plaintiff, demonstrate the deprivation of Simon's procedural due process right. Howard, 570 F.3d at 988. Second, Simon must prove that the alleged right was clearly established. Id. The Court selects which of these two inquiries to address first. Pearson, 555 U.S. at 235-36. Third, Simon must raise a genuine issue of material fact as to whether Gray would have known that the alleged action violated Simon's clearly established right. Tsai, 2010 WL 2605970, at *7.

Therefore, to overcome the qualified immunity defense for her procedural due process claim, Simon must demonstrate "that there has been a deprivation of a constitutionally-protected liberty or property interest and that the procedures used by the state to effect the deprivation were constitutionally inadequate." Tsai, 2010 WL 2605970, at *9 (citing In re Scott County Master Docket, 672 F. Supp. 1152, 1169 (D.

Minn. 1987)).  "Procedural due process fundamentally requires that an aggrieved party be provided with an opportunity to be heard at a meaningful time and in a meaningful manner."  In re Scott County Master Docket, 672 F. Supp. at 1169 (citing Matthews v. Eldridge, 424 U.S. 319, 333 (1976)).  However, the process a plaintiff is due is contingent upon the nature of the interest at stake.  See Bohn v. County of Dakota, 772 F.2d 1433, 1435-36 (8th Cir. 1985).  Here, the interest at stake is Simon's liberty interest in familial integrity.

Having identified the protected interest at stake, the Court turns to the procedural protections required.  See Mathews v. Eldridge, 424 U.S. 319 (1976).  In Mathews, the Supreme Court of the United States held that in determining which procedures are adequate to safeguard an individual's liberty interest, three factors should be considered:

> First, the private interest that will be affected by the initial action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burden that the additional or substitute procedural requirement would entail.

Id. at 335.

Applying these three factors, in Bohn, the Eight Circuit held that a parent's interest in family unity "is counterbalanced by the children's interest in continued freedom from abuse or neglect."  Id. at 1438.  In fact, in Bohn, the court upheld the very statutory procedure that Simon now challenges.  The Bohn Court explained that the Vulnerable Adults Act "is designed as a preventative measure to minimize the damage which vulnerable children might suffer from familial conflict."  Id.  And because the statute effectively mediates the parent's interests

and the interests of the state, the court concluded that the procedure was not constitutionally defective.  Id. at 1439.  "In cases which require fast action to protect the interests of children, e.g., Duchesne v. Sugarman, 566 F.2d 817, 826 (2d Cir. 1977), or where an *ex ante* intervention by the state was based on a generally reliable *ex ante* finding, see Barry v. Barchi, 443 U.S. 55, 64-65 (1979), such procedures have been upheld."  Id. at 1438-39.

Plaintiff argues that her procedural due process claim is based upon (1) a lack of pre-deprivation due process, and (2) insufficient and untimely post-deprivation due process.  Defendants respond to Simon's contention that Gray failed to provide pre-deprivation due process by arguing that Plaintiff has waived this claim because she did not object to M.R.'s placement in temporary respite care.  (Defs.' Reply at 7 [Doc. No. 67].)  Defendants claim that the "placement was consensual" (id. at 8), as evidenced by the fact that Simon signed an authorization form permitting the release of M.R.'s private information to the respite facility.  (Defs.' Mem. in Opp'n, Ex. 4 [Doc. No. 16-2]).  Thus, Defendants contend that "Plaintiff's right to due process did not attach until the County filed its petition for public guardianship."  (Defs.' Reply at 8 [Doc. No. 67].)  The Court disagrees.  The Court does not "'presume acquiescence in the loss of fundamental rights.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 236 (1973) (quoting Ohio Bell Telephone Co. v. Public Utilities Comm'n, 301 U.S. 292, 307 (1937)).  Plaintiff did not waive her right to assert her due process rights merely by signing a document releasing M.R.'s information to the temporary respite facility.  The document neither affirmatively

35

revoked Simon's guardianship status, nor does the Court understand the document to have this effect.

Nonetheless, insofar as Plaintiff's procedural due process claim is based on the fact that Gray violated Simon's procedural due process rights because Gray placed M.R. into temporary respite care before the final maltreatment adjudication, the Court finds that Gray is entitled to qualified immunity. Simon argues that M.R. should not have been removed from her custody based only upon the results of Banister's maltreatment investigation. (Pl.'s Mem. at 26-29 [Doc. No. 53].) However, as the Bohn Court explained, in cases where a state must act *ex-ante* to protect the safety of the child, such procedures have been upheld. Bohn, 772 F.2d at 1438. Therefore, Bohn counsels the Court to hold that Gray acted reasonably by immediately removing M.R. from his home after the investigation substantiated the claims of abuse, in order to protect M.R.'s safety.

Insofar as Plaintiff's claim is based on insufficient and untimely post-deprivation due process, the Court finds that it need not reach the issue of qualified immunity because Gray did not cause the alleged deficiencies. Simon identified several problems with the post-deprivation due process she experienced. Simon claims that she did not receive a fair DHS maltreatment hearing because certain documents were not admitted (Simon Dep. 62:5-6 [Doc. No. 49-1]); portions of the recorded hearing were "taped over" (id. at 62:6-9); the DHS judge who presided over the first two days of the hearing, Judge Johnson, did not render the final decision (id. at 63-64); Judge Vargo, the DHS judge who rendered the final decision, based her decision on an incomplete transcript of the hearing since portions of the hearing were taped over (id.); and Judge Vargo

misidentified Simon in her findings of fact, which reflects her lack of knowledge about the facts of Simon's case (id. at 65:19-25).  Simon also argued that she received an unfair DHS disqualification hearing, after which she lost her license for working in licensed care facilities.  Plaintiff claims that the disqualification hearing was procedurally flawed because Judge Alvarado primarily based his disqualification determination on Judge Vargo's erroneous maltreatment finding.  (Id. at 75:18-23.)  Plaintiff also alleges that she was denied timely post-deprivation due process because an *Ex Parte* Petition for the Appointment of a Public Guardian was not filed until June 17, 2011, forty-five days after M.R. was removed from Simon's care and custody.  (Kane Aff., Ex. 5 [Doc. No. 56].)  Finally, Plaintiff contends that the DHS has prohibitively priced the hearing transcripts, making it impossible for Simon to request or rely on the transcripts.  (See Pl.'s Mem. at 13 [Doc. No. 53].)  Whether or not there is merit to these claims, Gray had no role in facilitating these administrative hearings.

Since a § 1983 damages action is in essence a tort action, Simon cannot withstand summary judgment if she is unable to satisfy the requisite causation element.  See In re Scott County, 672 F. Supp. at 1165-66.  In In re Scott County, the Court held that "[b]ecause the decision to arrest plaintiffs and to separate [the] children from [their] parents was made by others, with only very minimal input, if any at all, from the social workers, plaintiffs simply [could not] satisfy this 'but for' precondition."  Id.

Here, as in In re Scott County, Simon cannot prove that Gray caused the procedural deficiencies alleged.  Although she provided testimony, Gray did not make any final maltreatment or disqualification decisions.  Gray did not tape over the recording

of the hearing, refuse to admit certain documents, render any Orders, or prohibitively price the DHS hearing transcripts.  Therefore, Simon cannot satisfy the "'but for' precondition" required.  See id.  Similarly, Gray did not cause the alleged untimely filing of the *Ex Parte* Petition for the Appointment of a Public Guardian.  Plaintiff fails to allege that Gray was responsible for filing this motion, and no facts in the record demonstrate Gray's role with this petition.  In sum, the Court need not even reach the qualified immunity defense, because Gray is the improper defendant for Plaintiff's post-deprivation procedural due process claim.

Plaintiff additionally argues that even if the DHS judges had followed the procedure required by Minnesota state law, that process also violates Plaintiff's procedural due process rights.  Simon claims that the statutory procedure violates the Due Process Clause because "no consideration may be given to the family unit . . . [when conducting] investigation and provi[ding] . . . adult protective services."  (Pl.'s Mem. at 29 [Doc. No. 53].)  Again, the Court finds that Defendant Gray is an improper defendant for this claim.

First, Gray did not personally implement the procedures challenged by Simon.  Although Gray provided information and testimony for Banister's investigation and the DHS administrative proceedings, she neither personally conducted the investigation nor rendered any final decisions about the maltreatment allegations.

Second, Gray did not "cause" the State of Minnesota to adopt these investigative and adult protective procedures.  See 42 U.S.C. § 1983 ("Every person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . .

to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . .").  In <u>Jackson v. Nixon</u>, the Eighth Circuit held the Director of Department of Corrections liable under § 1983 because of his statutory duty to oversee the implementation of the official policies the plaintiff challenged.  747 F.3d 537, 544 (8th Cir. 2014).  Here, unlike the defendant in <u>Jackson</u>, Gray does not have a statutory duty to oversee the implementation of the procedure that Simon challenges.  Moreover, even had Plaintiff brought suit against the appropriate defendant, the Court would likely find that the procedures in the Vulnerable Adults Act are constitutionally sufficient as the Eighth Circuit did in <u>Bohn</u>.  <u>See</u> <u>Bohn</u>, 772 F.2d at 1439.  Accordingly, the Court finds that Defendant Gray is the improper defendant for Plaintiff's procedural due process claims.

## 2.  Section 1983 Claim Against Gray, in Her Official Capacity

Next, the Court addresses Plaintiff's § 1983 substantive due process and procedural due process claims against Gray, in her official capacity.  "Suits against public employees in their official capacity are the legal equivalent of suits against the government entity itself."  <u>Bankhead</u>, 360 F.3d at 844.  To prevail on her substantive due process claim against Gray, in her official capacity, Simon must prove that Gray "acted in an arbitrary or capricious manner, or so as to shock the conscience."  <u>Herts</u>, 345 F.3d at 587.

Reiterating its finding in Section III(C)(1)(a) above, the Court holds that, viewing all facts in the light most favorable to Plaintiff, Gray's actions do not shock the conscience.  "'The right to family integrity clearly does not include a constitutional right

to be free from child abuse investigations,' as the state has a strong interest in protecting the safety and welfare of minor children, particularly where protection is considered necessary as against the parents themselves." <u>Dornheim</u>, 430 F.3d at 925-26 (quoting <u>Manzano</u>, 60 F.3d at 510 (internal marks omitted)).  Gray's actions included providing testimony to Banister and the DHS judges about the abuse she perceived, and recommending that Banister substantiate the abuse allegations.  Given the fact that Gray's concerns about M.R.'s wellbeing were substantiated by others, and Plaintiff herself admitted to slapping M.R., Gray's actions during the investigation and administrative proceedings do not shock the Court's conscience or offend judicial notions of fairness.  <u>See</u> <u>Fitzgerland</u>, 787 F.2d at 408; <u>Ray</u>, 2010 WL 1390866, at *8; <u>In re Scott County</u>, 672 F. Supp. at 1166-67.  Therefore, Plaintiff fails to state a cognizable substantive due process claim against Gray, in her official capacity.  Accordingly, the Court grants Defendants' Motion for Summary Judgment as it applies to Plaintiff's substantive due process claims.

As for Plaintiff's procedural due process claim against Gray, in her official capacity, the Court reiterates its finding from Section III(C)(1)(b) above.  The Court finds that under <u>Bohn</u> the pre-deprivation due process Simon received was constitutionally adequate.  <u>See</u>  <u>Bohn</u>, 772 F.2d at 1439.  Since Gray could have removed M.R. from Simon's home before Banister's investigation was complete, she clearly was empowered to remove M.R. after the abuse allegations were substantiated.

As for Plaintiff's claims about the post-deprivation due process she received, the Court restates its finding that Gray did not cause the alleged procedural deficiencies to

occur.  Gray was not responsible for facilitating or implementing the DHS proceedings.  For example, Gray did not delete part of the tape recording from the DHS proceeding, nor did she select the evidentiary standards employed by the judges.

The Court reiterates that Gray also remains an improper defendant for Plaintiff's claim that the statutory procedures for guardianship removal, had they even been followed, violated her due process rights.  Simon contends that because an ACSS investigator and a DHS judge cannot consider the importance of preserving the family unit, the process of investigating and providing adult protective services violates the Due Process Clause.   (See Pl.'s Mem. at 29 [Doc. No. 53].)  Gray's official position is an ACSS social worker.  (Compl. ¶ 7 [Doc. No. 1].)  Therefore, she does not have the statutory duty or obligation to oversee the implementation of the official policies that Simon challenges.  See Jackson, 747 F.3d 537, 544 (8th Cir. 2014).  For instance, Gray cannot change the cost of the DHS transcripts; nor can she alter the factors that an ACSS investigator or DHS judge may take under consideration.  In sum, the Court grants Defendants' Motion to Summary Judgment as applied to Plaintiff's procedural due process claims as well.

### D.  Count Two: Minnesota State Constitution Claim

Similar to Count One, Plaintiff's Count Two is limited to Lisa Gray because Simon failed to bring suit against a proper governmental defendant.  In Count Two of Plaintiff's Complaint, she seeks money damages for due process violations of her "liberty interest in her familial integrity," pursuant to Article I, section 7 of the Minnesota State Constitution.  (Compl. ¶ 31 [Doc. No. 1].)  Plaintiff's Count Two rests upon the same

factual allegations which support her Count One claim.  Defendants argue that Plaintiff's

claim "fails because the State Constitution does not provide a private remedy for the

violation of constitutional rights."  (Defs.' Mem. at 13 [Doc. No. 48].)  Simon does not

refute this argument in her response brief.  (See generally Pl.'s Mem. in Opp'n [Doc. No.

53].)  Thus, Simon concedes that she fails to state a cognizable claim under the

Minnesota Constitution.  (See Defs.' Reply at 1 [Doc. No. 67].)  The Court agrees.

"Minnesota courts have not recognized a private right of action for a violation of

the Article I, Section 7 of the Minnesota Constitution."  Andersen v. County of Becker,

No. 09-cv-5687 (ADM/RLE), 2009 WL 3164769, at *13 (D. Minn. Sept. 28, 2009); see

Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County, Minn., 922 F. Supp. 1396,

1400 (D. Minn. 1996) rev'd on other grounds, Ben Oehrleins & Sons & Daughter, Inc. v.

Hennepin County, 115 F.3d 1372 (8th Cir. 1997) (citing Bird v. State Dept. of Public

Safety, 375 N.W.2d 36, 40 (Minn. Ct. App. 1985)) (holding that "Minnesota does not

recognize a damage remedy for violations of Art. I, § 7 of the Minnesota Constitution");

see also Thomsen v. Ross, 368 F. Supp. 2d 961, 975 (D. Minn. 2005) (finding that

"Minnesota has not enacted a statute equivalent to § 1983, although Minnesota courts

have recognized direct causes of action for violating certain sections of the Minnesota

Constitution.").  Therefore, Plaintiff fails to state a cognizable claim under the Minnesota

Constitution.  As a result, the Court grants Defendants' Motion for Summary Judgment

with respect to Plaintiff's Count Two.

### E.  Count Three: Appeal of Maltreatment and Disqualification Determinations

In Count Three of Plaintiff's Complaint, Simon "appeals the maltreatment and disqualification [decisions] from the DHS as unsupported by the evidence in the record and contrary to the statutory requirements."  (Compl. ¶ 36 [Doc. No. 1].)  Defendants argue that Plaintiff's Count Three should be dismissed for lack of subject matter jurisdiction.  (Defs.' Mem. at 13-14 [Doc. No. 48].)  Plaintiff fails to rebut Defendants' assertions in her response brief.  (See generally Pl.'s Mem. in Opp'n [Doc. No. 53]; Defs.' Reply at 1 [Doc. No. 67].)  The Court finds that it lacks subject matter jurisdiction with respect to Count Three.

Under Minnesota law, "any party who is aggrieved by an order of the commissioner of human services . . . may appeal the order to the district court of the county responsible for furnishing assistance, or, in appeals under subdivision 3b ["maltreatment and disqualification hearings"], the county where the maltreatment occurred."  Minn. Stat. Ann. § 256.045, subd. 7 (2014).  In fact, this Court relied on this precise statutory provision when dismissing a case for lack of subject matter jurisdiction in Wilson v. Dryden, 169 F. Supp. 2d 1010, 1013 (D. Minn. 2001).  In Wilson, the plaintiff sought to appeal the DHS's finding that she had received excessive welfare benefits.  Id. at 1012.  The Court held that, "[t]o the extent that this action is an appeal of the [DHS] Commissioner's final order of December 8, 1999, then it should have been filed in state district court pursuant to Minn. Stat. § 256.045, subd. 7."  Id. at 1013.  Therefore, Defendants correctly note that "[t]he law does not provide for an appeal to

federal courts." (Defs.' Mem. at 13 [Doc. No. 48].) Rather, Plaintiff may file an appeal with a Minnesota state trial court.

Furthermore, the Court may not exercise supplemental jurisdiction over Plaintiff's Count Three. Although the appeal of the maltreatment and disqualification decisions is arguably based on the same nucleus of operative facts as Plaintiff's § 1983 claims, supplemental jurisdiction only applies to a "civil action of which the district courts have original jurisdiction." 28 U.S.C. § 1367(a). Therefore, in order to exercise supplemental jurisdiction "over some claims in an action," the Court must first determine that it has "original jurisdiction over at least one claim in the complaint." Myers v. Richland County, 429 F.3d 740, 748 (8th Cir. 2005) (citing Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U.S. 546, 557-59 (2005)). Here, the Court granted summary judgment for Defendants on Plaintiff's Counts One and Two. Therefore, the Court finds that it does not have original jurisdiction over at least one claim in the Complaint. Accordingly, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's Count Three.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment [Doc. No. 47] is **GRANTED**, consistent with this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 21, 2014          s/Susan Richard Nelson          
                                  SUSAN RICHARD NELSON
                                  United States District Judge